**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**HATTIESBURG DIVISION**


**CHARLES A. REEVES**                                                                 **PLAINTIFF**

**VERSUS**                                                                 **2:09cv43KS-MTP**

**EQUIFAX INFORMATION SERVICES, LLC;**
**and MEDICAL DATA SYSTEMS, INC.**                                         **DEFENDANTS**


## MEMORANDUM OPINION AND ORDER

This matter is before the court on a Motion for Partial Summary Judgment **[#135]**

filed on behalf of the plaintiff and on a Motion for Summary Judgment **[#141]** filed on

behalf of defendant, Equifax Information Services, LLC.  The court, having reviewed the

motions, the responses, the pleadings and exhibits on file, the authorities cited and

being otherwise fully advised in the premises, finds that neither motion is well taken and

that both should be denied except as to the defendant's motion in regard to the

plaintiff's state law claim of libel, which should be granted.  The court finds specifically

as follows:


## FACTUAL BACKGROUND

In August of 2003, the plaintiff, Charles A. Reeves (Chip) sent two letters to

Equifax Information Services, LLC. ('EIS" or "Equifax") notifying them of disputes

relating to his credit report.  On the second page of the August 21, 2003 letter, Chip

advised Equifax that he had been dealing with the inaccurate information contained in

his credit report since December of 2001.  These letters provided Equifax with Chip's

correct name, address, date of birth and social security number, together with supporting documentation. These letters also informed Equifax that there appeared to be some confusion between Chip and a man who lives in Vicksburg who is named Charles E. Reeves (referred to by the plaintiff as "the dead beat"). Chip and the dead beat have similar names and social security numbers, but different addresses and different dates of birth. In fact, their SSNs are identical matches for seven of nine numbers with the last two merely transposed.

Some of the accounts, disputed by Chip, were from River Regions Medical Center. These accounts in fact belonged to the dead beat. The collection agencies for these accounts were Medical Data Systems and Account Services. In January of 2004, Chip filed suit against Equifax and others for failing to correct inaccurate information contained in his credit file. *See Reeves v. Experian, et al*, Civil Action No. 2:04-CV-48BN. That case was settled in January of 2005.

During the settlement process, Equifax provided a credit report to Chip dated January 27, 2005. That credit report again showed the accounts from River Regions Medical Center which had been disputed by Chip. Counsel for the plaintiff informed Counsel for Equifax of the inclusion of the disputed items. Thereafter, the River Regions accounts were deleted from Chip's credit report and Chip was provided with a credit report dated January 31, 2005 showing that the River Regions accounts had been deleted.

By August of 2005, Chip learned that Equifax had allegedly reinserted the previously deleted inaccurate credit information and was again reporting some of the same River Regions collection accounts in his credit file. Counsel for the plaintiff

notified Equifax of these inaccuracies by letter dated August 19, 2005. On September 1, 2005, Equifax responded to Chip's dispute by notifying him that the inaccurate collection accounts had been deleted from his credit file. Additionally, that credit report showed that the plaintiff's account had been blocked for promotional purposes.

In September of 2007, the plaintiff applied for a loan with The First National Bank of the Pinebelt. The bank obtained a credit report from Equifax which showed that the plaintiff had a credit score of 594. This Equifax report also contained some of the same collection accounts from River Regions Medical Center and a collection account from Performance Capital. None of these accounts belonged to Chip. Nonetheless, based only upon his previous dealings with the bank, Chip received the loan.

After being informed of the contents of his Equifax credit report, Chip requested a copy of his credit file from Equifax. Chip was provided with two credit reports, both dated October 18, 2007 and both showing Chip's name, address, date of birth and social security number. These credit reports contained two separate confirmation numbers, 7291048412 and 7291048473. The credit report bearing confirmation number 7291048412 contained some of the same River Regions collection accounts, plus additional collections accounts from River Regions and three collection accounts from other creditors. The other credit report, bearing confirmation number 7291048473, accurately reflected Chip's credit history. It did not show any collection accounts or any derogatory credit history. It does, however, show that Chip's credit file had been blocked for promotional purposes.

The October 18, 2007 credit report bearing confirmation number7291048412, reflects that Chip's credit file had been obtained by Imagine/Fbofd, and Verizon

Wireless. Neither Chip nor his wife ever applied for credit with these companies. Charles Reeves Depo. pg. 226, Lynn Reeves Depo. pg. 78, 103, 104.

The October 18, 2007 credit report bearing confirmation number 7291048412 also reflects that Equifax had provided, what it refers to as, "account review" access to Chip's credit file to Imagine/Fbofd, even though Chip had never applied for an account with this company and had never had an account with this company. The Equifax credit report states, "Am or AR - Inquiries with these prefixes indicate a periodic review of your credit history by one of your creditors. (Am and AR inquiries remain for 12 months)." *See* Exhibit 7 to plaintiff's motion. The account reviews were not conducted by Chip's creditors, but rather, creditors of the dead beat. Nonetheless, the name, address, social security number and date of birth of Chip Reeves were provided to the creditors of the dead beat by Equifax as a result of these "account reviews."

On November 1, 2007, Counsel for the plaintiff asserts that he wrote a letter to the entities which showed collection accounts on the plaintiff's credit report, which were Medical Data Systems, Account Services, Performance Capital, River Regions Medical Center and Equifax. Counsel avers that he instructed these entities to delete the collection accounts from the plaintiff's credit file (Exhibit 10). Equifax's 30(b)(6) deponent, Ms. Fluellen, has stated that Equifax does not have a record of receiving this letter. Fluellen Depo. pg. 199. Ms. Fluellen could not testify that the letter was not received. *Id.* at pg. 199.

On December 20, 2008, the plaintiff's wife went to Southern Wholesale Furniture to purchase a bedroom suite for their daughter for Christmas. The plaintiff asserts that in his marriage, it was standard practice for his wife, Lynn to apply for credit in his

name. Charles Reeves Depo. pg. 232. This was always done with Chip's permission. *Id.* at pg. 235. The application was submitted to American General Finance and credit was denied. Lynn Reeves Depo. pg. 15, 50, 56). This denial was confirmed by letter from American General. Exhibit 12.

As a result of this credit denial Chip requested a credit report from Equifax. Chip received an Equifax credit report dated February 9, 2009. Exhibit 13. This credit report shows the same collection accounts from River Regions, plus additional collection accounts from the hospital. It also showed collection accounts from Healthcare Financial Services, returned checks from Certegy and Global Payment Check Services, and collection accounts from GEMB/Belk (Belk), GEMB/JC Penney (Penney's), Jefferson Capital (Jefferson) and Pinnacle Credit Services (Pinnacle).

The February 2009, credit report also showed that Chip's credit file had been provided to GEMB/Walmart (Walmart), Belk, Sprint/Nextel (Sprint), Tower Loan (Tower), Verizon Wireless (Verizon) and Imagine/Fbofd (Imagine). Each of these inquires occurred between March of 2007 and October of 2008. Notably, there is no inquiry by American General shown on Chip's credit report, which had been ordered as a result of the denial of credit by American General. Neither Chip nor his wife ever submitted credit applications to any of these companies, other than American General. Charles Reeves Depo. pg. 232, Lynn Reeves Depo. pg. 103, 104, 105.

The February 2009, credit report also showed on page 9 of 14 that Belk, CB&T and Imagine were provided with "account review" access to Chip's credit file, even though Chip has never had accounts with these entities. It also shows that River Regions Health was provided with some type of access to Chip's personal information.

This is shown as a "Chs" transaction, but there is no definition on the credit report of a "Chs" transaction.

As part of discovery, Counsel for Equifax provided a copy of Chip's credit report dated June 24, 2009. Exhibit 14. This credit report shows Chip's correct name, present address, date of birth and social security number. This report, however, shows four addresses in Vicksburg, Mississippi as being Chip's previous addresses. This credit report also shows the unauthorized credit inquires from Walmart, Belk, Sprint and Tower, but again, notably, did not show the credit inquiry from American General in December of 2008. Neither Chip nor his wife applied for credit with Walmart, Belk, Sprint or Tower. Lynn Reeves Depo. pg. 103, 104, 105, Charles Reeves Depo. pg. 232.

On January 27, 2010, Counsel for Equifax provided another copy of the plaintiff's credit report. Exhibit 15. This credit report shows Chip's correct name, current address, previous address, date of birth and social security number. For the first time, this credit report dated January 27, 2010, showed the American General inquiry on December 20, 2008.

During discovery, the plaintiff issued numerous subpoenas to entities which had appeared on Chip's credit report. As a result of these subpoenas, the plaintiff received several copies of applications for credit completed by the dead beat. Exhibit 16. The page, Bates stamped 344 of Exhibit 16, shows that on February 13, 2009, the dead beat applied for credit with Dillards using his own name, address, date of birth and social security number. On Exhibit 15, at page 6 of 10, at the top of the page, the Equifax credit report shows a credit inquiry by Dillards on February 13, 2009.

Exhibit 17 attached to the motion is information obtained from GE Money Bank, which includes an application which was completed by the dead beat for a Belk credit card. On the first page, it shows that this application was "decisioned" on September 26, 2008. On page 5 of 6 of the credit report dated June 24, 2009 (Exhibit 14), it shows that Belk received Chip's credit report on September 26, 2008. The balance of these documents clearly show that a credit card was, in fact, issued to the dead beat, based upon Chip's credit file. The account statements also show that the dead beat incurred a high balance of $1,232.51 (April 29, 2009 statement) and never made any payment on the account. There was one credit, which was for returned merchandise in the amount of $26.26. In April of 2009, the account was charged off.

On July 6, 2009, Marsha Hinton in the plaintiff's Counsel's office returned a call to a Wendy Miller, who was employed by the Law Office of Wanda Cross. The Law Office of Wanda Cross had contacted the plaintiff in an effort to collect the amount due on the Belk credit card, issued to the dead beat. Ms. Cross's office contacted Chip for payment in spite of the fact that on February 24, 2009, Counsel for the plaintiff notified Belk that the account which was being reported on Chip's credit report did not belong to him and that he did not have a Belk account. Exhibits 18 and 19.

Equifax provided what it termed "promotional inquiry" information relating to Chip to Jefferson Capital Systems (Jefferson) and Phillips and Cohen Associates (Phillips). Both Jefferson and Phillips are collection agencies (Exhibit 21) which did not have a business relationship with Chip. Neither of these companies apparently intended to make Chip a firm offer of credit and no information relating to Chip should have been provided to them through the "promotional inquiry" mechanism.

When the problems with Chip's credit report first surfaced, it appeared to be a case of identity theft. Chip has always lived in Laurel, Mississippi. The other Mr. Reeves lives in Vicksburg, Mississippi (the dead beat). These men have similar names and similar social security numbers, but different addresses and different dates of birth.

The defendant states that as part of the original settlement, it was to correct the plaintiff's credit file. However, when EIS blocked the incorrect identifying information from the plaintiff's file, it did not block the other Charles Reeves' social security number from Chip's file. Because of this error, a second file was created with the name "Charles Reeves," which contained the plaintiff's address and social security number, but which also contained some accounts that belonged to the other Charles Reeves. In short, there were two files for the plaintiff in EIS's database -- one with his correct information and one with some accounts that did not belong to him.

On March 16, 2009, the plaintiff commenced this action against EIS and Medical Data Systems Inc. ("MedData") for alleged violations of the Fair Credit Reporting Act, ("FCRA"), 15 U.S.C. §§ 1681 et seq., and a state law claim of libel. Complaint, ¶¶ 41, 43. On November 2, 2009, the plaintiff filed an Amended Complaint and added Equifax Inc. as a defendant. Equifax, Inc. has been dismissed from this case by separate order. As to EIS, the plaintiff contends that it failed to employ and/or implement proper procedures to resolve disputes and verify accounts, thereby causing him damages.

## STANDARD OF REVIEW

The Federal Rules of Civil Procedure, Rule 56(c) authorizes summary judgment where "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine dispute as to any material

fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corporation v. Catrett*, 477 U.S. 317, 322, 91 L.Ed.2d 265, 106 S.Ct. 2548 (1986). The existence of a material question of fact is itself a question of law that the district court is bound to consider before granting summary judgment. *John v. State of La. (Bd. of T. for State C. & U.)*, 757 F.2d 698, 712 (5th Cir. 1985).

A Judge's function at the summary judgment stage is not himself to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment is appropriate. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 91 L.Ed.2d 202, 106 S.Ct. 2505 (1986).

Although Rule 56 is peculiarly adapted to the disposition of legal questions, it is not limited to that role. *Professional Managers, Inc. v. Fawer, Brian, Hardy & Zatzkis*, 799 F.2d 218, 222 (5th Cir. 1986). "The mere existence of a disputed factual issue, therefore, does not foreclose summary judgment. The dispute must be genuine, and the facts must be material." *Id.* "With regard to 'materiality', only those disputes over facts that might affect the outcome of the lawsuit under the governing substantive law will preclude summary judgment." *Phillips Oil Company v. OKC Corporation*, 812 F.2d 265, 272 (5th Cir. 1987). Where "the summary judgment evidence establishes that one of the essential elements of the plaintiff's cause of action does not exist as a matter of law, . . . all other contested issues of fact are rendered immaterial. *See Celotex*, 477 U.S. at 323, 106 S.Ct at 2552." *Topalian v. Ehrman*, 954 F.2d 1125, 1138 (5th Cir. 1992). In making its determinations of fact on a motion for summary judgment, the Court must view the evidence submitted by the parties in a light most favorable to the

non-moving party.  *McPherson v. Rankin*, 736 F.2d 175, 178 (5th Cir. 1984).

The moving party has the duty to demonstrate the lack of a genuine issue of material fact and the appropriateness of judgment as a matter of law to prevail on his motion.  *Union Planters Nat. Leasing v. Woods*, 687 F.2d 117 (5th Cir. 1982).  The movant accomplishes this by informing the court of the basis of its motion, and by identifying portions of the record which highlight the absence of genuine factual issues.  *Topalia*n, 954 F.2d at 1131.

"Rule 56 contemplates a shifting burden:  the nonmovant is under no obligation to respond unless the movant discharges [its] initial burden of demonstrating [entitlement to summary judgment]."  *John*, 757 F.2d at 708.  "Summary judgment cannot be supported solely on the ground that [plaintiff] failed to respond to defendants' motion for summary judgment," even in light of a Local Rule of the court mandating such for failure to respond to an opposed motion.  *Id.* at 709.

However, once a properly supported motion for summary judgment is presented, the nonmoving party must rebut with "significant probative" evidence.  *Ferguson v. National Broadcasting Co., Inc.*, 584 F.2d 111, 114 (5th Cir. 1978).  In other words, "the nonmoving litigant is required to bring forward 'significant probative evidence' demonstrating the existence of a triable issue of fact."  *In Re Municipal Bond Reporting Antitrust Lit.* , 672 F.2d 436, 440 (5th Cir. 1982).  To defend against a proper summary judgment motion, one may not rely on mere denial of material facts nor on unsworn allegations in the pleadings or arguments and assertions in briefs or legal memoranda. The nonmoving party's response, by affidavit or otherwise, must set forth specific facts showing that there is a genuine issue for trial.  Rule 56(e), Fed.R.Civ.P.  *See also, Union Planters Nat. Leasing v. Woods*, 687 F.2d at 119.

While generally "'[t]he burden to discover a genuine issue of fact is not on [the] court,' (*Topalian* 954 F.2d at 1137), 'Rule 56 does not distinguish between documents merely filed and those singled out by counsel for special attention-the court must consider both before granting a summary judgment.'" *John*, 757 F.2d at 712 (quoting *Keiser v. Coliseum Properties, Inc.*, 614 F.2d 406, 410 (5th Cir. 1980)).

## FAIR CREDIT REPORTING ACT

An essential element that the plaintiff must establish for a claim under the FCRA is evidence of an injury and that the injury was proximately caused by a consumer reporting agency. *See Cousin v. Trans Union Corp.*, 246 F.3d 359, 369 (5th Cir. 2001). Pursuant to 15 U.S.C. § 1681o, to recover for negligent violations under the FCRA, the plaintiff must prove that EIS proximately caused him actual damages. Summary judgment is appropriate in a case brought under the FCRA when the plaintiff cannot present evidence establishing that the defendant proximately caused him damages. *See, e.g., Rambarran v. Bank of America*, 609 F. Supp. 2d 1253, 1265-66 (S.D. Fla. 2009); *Burns v. Bank of America*, 655 F. Supp. 2d 240, 250 (S.D.N.Y. 2008); *Collins v. Experian Credit Reporting Services*, 494 F. Supp. 2d 127, 136 (D. Conn. 2007); *Enwonwu v. Trans Union, LLC*, 364 F. Supp. 2d 1361, 1365 (N.D. Ga. 2005); *Caltabiano v. BSB Bank & Trust Co.*, 387 F. Supp. 2d 135, 141 (E.D.N.Y. 2005) (citing *Casella v. Equifax Credit Info. Servs.*, 56 F.3d 469, 473 (2nd Cir. 1995)); *Spector v. Experian Information Services, Inc.*, 321 F. Supp. 2d 348, 356 (D. Conn. 2004).

Without a causal relationship between the alleged violation of the statute and the loss of credit, or some other harm, a plaintiff cannot obtain an award of actual damages. *See Crabill v. Trans Union, L.L.C.*, 259 F.3d 662, 664 (7th Cir. 2001) (citing *Philbin v.*

*Trans Union Corp.*, 101 F.3d 957, 963 (3rd Cir. 1996)); Casella, 56 F.3d at 473; Cahlin v.

General Motors Acceptance Corp., 936 F.2d 1151, 1160-61 (11th Cir. 1991); *Konter v.*

*CSC Credit Services, Inc.*, 606 F. Supp. 2d 960, 967 (W.D. Wis. 2009); *Young v. Harbor*

*Motor Works, Inc.*, 2009 WL 187793, at *5 (N.D. Ind. Jan. 27, 2009); *Garrett v. Trans*

*Union, LLC,* 2006 WL 2850499, at **10-11 (S.D. Ohio Sept. 29, 2006). As a first

defense, EIS alleges that the plaintiff cannot meet his burden to establish that EIS

caused him damages and, therefore, the court should grant summary judgment in favor

of EIS.


## CONSUMER REPORTING AGENCIES AND FCRA

EIS is a consumer reporting agency as defined by the FCRA.  EIS gathers

information from various sources, including credit card companies, mortgage

companies, collection agencies, and court records, to create credit files on more than

200 million consumers in the United States.  EIS assembles that information into credit

reports that it provides to subscribers who have a permissible purpose for obtaining the

reports.  According to EIS, it accepts information regarding a consumer's credit only

from those sources of credit information that, either on the basis of EIS's prior

experience, or because of the particular source's reputation, are determined by EIS to

be reasonably reliable sources.

Lenders report millions of accounts to EIS daily; they provide identifying

information, including address, social security number and date of birth.  A consumer's

original credit file is created based on the identifying information that data furnishers

provide.  The file is then updated as new information comes into EIS that matches the

consumer file that is already in the system.  As the updates arrive, EIS's computer

system sorts the updated information onto the existing consumer files by matching identifying information provided by the data furnisher against each existing consumer's identifying information. EIS contends that its matching search is highly sophisticated and utilizes algorithms based on thirteen matching elements and all possible combinations of those thirteen elements.

EIS also asserts that it maintains reasonable procedures designed to assure maximum possible accuracy of the information in the credit files that it maintains and to address disputes that it receives from consumers concerning information contained in their credit files. According to the defendant, upon receipt of a dispute from a consumer, EIS first locates the consumer's file in its database based on the identifying information. If the consumer has not provided information sufficient to locate the file, then EIS sends a letter to the consumer requesting additional information.

After locating the file, EIS reviews and considers all the relevant information provided by the consumer regarding the dispute and reviews the contents of the consumer's credit file. If the consumer has made a previous dispute with EIS, it will also review the information related to the prior contact. If further investigation of the consumer's dispute is required, then EIS notifies the source of the information (often referred to as the "data furnisher") and advises it of the consumer's dispute, describes all relevant information, and provides the consumer's account information as it currently appears on the credit file. EIS requests that the data furnisher investigate the consumer's dispute and advise EIS if the account information is inaccurate. These communications between EIS and the data furnisher are generally made through a process wherein EIS electronically transmits a form called an Automated Consumer Dispute Verification ("ACDV").

If the data furnisher advises EIS to delete or otherwise update the account information, then EIS takes the necessary action. If the data furnisher advises EIS that it investigated the item and verifies that it is accurate, EIS generally will take no action but will leave the account as is. In some circumstances, EIS will conduct an additional investigation (such as contacting the source again, contacting others, or contacting the consumer) or apply certain rules, which could result in the account being updated or deleted. Ultimately, in the last step in the reinvestigation, an EIS employee called a "Maintenance Reviewer" will analyze the dispute and results before sending them to the consumer. Following the completion of its reinvestigation, EIS sends the consumer a letter containing the results of the reinvestigation along with an updated credit file and a summary of the consumer's rights under the FCRA.

## ANALYSIS OF THE PRESENT DISPUTE

EIS asserts that it has had very limited communication with the plaintiff and contends that the plaintiff has not contacted EIS in more than five years and that his attorney has not contacted EIS on his behalf since August 2005. Fluellen Dec., ¶ 36; Deposition of Charles A. Reeves ("Reeves Dep."), 63:11-25; 64:2-4; 64:11; 147:12-15, attached to EIS's Motion for Summary Judgment as Exhibit F; Deposition of Marsha Hinton ("Hinton Dep."), 66:18-67:2, attached to EIS's Motion for Summary Judgment as Exhibit G; Fluellen Dep., 198:20-199:14. The defendant argues that the plaintiff has not contacted EIS at any time since he settled his prior lawsuit against EIS in January 2005. Fluellen Dec., ¶ 37; Reeves Dep., 63:11-25; 64:11-24; 147:12-15.

However, the plaintiff alleges that on November 1, 2007, his attorney sent a dispute letter to EIS, MedData, and a number of other companies. Am. Compl., ¶ 14;

Reeves Dep., 167:8-14; Hinton Dep., 19:14-25; 33:9-13.  EIS has asserted that it has no record of receiving the November 2007 letter.  Fluellen Dep. 198:20-199:2; 199:7-14. Neither does MedData.  Deposition of Paul Grossman, MedData ("Grossman Dep."), 23:11-15, attached to EIS's Motion for Summary Judgment as Exhibit H.

The plaintiff has identified two transactions in which he claims EIS caused him economic damages, one with The First and the other with Southern Wholesale Furniture. EIS contends, however, that the plaintiff cannot recover damages from EIS based on either of those transactions as a matter of law.  First, EIS points out that while the plaintiff complains that he has bad credit and has been unable to obtain credit, he has never been denied a loan by The First, his local bank.  Tidwell Dep., 23:6-11.

It is undisputed that The First has never taken any adverse action with regard to any applications that the plaintiff has made for credit.  *Id.* at 24:3-5; 24:7-8.  For instance, in October 2006, the plaintiff applied for and received a loan from The First of $7,000 to pay for taxes.  *See* Reeves Dep., 150:10-17; Tidwell Dep., 26:10-22; 27:2-7; 27:11-28:6.  He got the best rate available on the loan at that time.  *Id.* at 31:17-20.  The plaintiff argues that The First required him to use a CD for collateral to obtain this loan due to his alleged bad credit.  However, Mr. Tidwell testified that because the term of the loan was 60 months, the bank required some type of collateral.  *Id.* at 28- 21:29-7. Reeves Dep., 150:10-17; 151:10-15.  In fact, it appears that the bank did not even pull a credit report for purposes of this transaction.  Tidwell Dep., 27:21-24.

In September 2007, the plaintiff applied, and was approved for a loan from First National Bank of Pine Belt to purchase a vehicle.  Reeves Dep., 112:17-23; Tidwell Dep., 50:2-51:9; 63:11-17.  The bank granted the plaintiff the loan of $5,500 and he received the interest rate for which he applied. Id. at 50:2-13; 52:10-12.  Though Mr.

Tidwell received a credit report from EIS that contained some inaccurate information, he overlooked it, based on his past dealings with the plaintiff, and approved the loan. *Id.* at 54:11-14. Thus, EIS contends that the credit report did not impact Mr. Reeves' application whatsoever. *See Ladner v. Equifax Credit Information Services, Inc.*, 828 F. Supp. 427, 432 (S.D. Miss. 1993) (granting summary judgment due to absence of an adverse action and therefore, a lack of damages). However, the plaintiff and Tidwell have testified that the faulty credit report led to a conversation between the two which caused extreme embarrassment to the plaintiff and made Tidwell uncomfortable. To Tidwell's credit, he accepted the plaintiff's word that the bad credit information was not his. The defendant tries to parlay that act to its benefit by asserting that the plaintiff did not suffer from the misinformation furnished by EIS. While the plaintiff got the loan, other damages from the transaction may well have been incurred by the plaintiff, such as emotional distress. Whether the plaintiff suffered any such damages from this transaction is best left to the jury.

Next, the plaintiff alleges that Southern Wholesale Furniture denied him credit based on his EIS credit file. Am. Compl., ¶ 25; Reeves Dep., 174:15-21. EIS contends, however, that the plaintiff was not denied credit in that transaction. On December 20, 2008, the plaintiff's wife and their daughter went to Southern Wholesale Furniture to purchase the daughter some furniture. Reeves Dep., 42:23-43:7; Lynn Reeves Dep., 41:2-7; Deposition of Kelly Blackledge ("Blackledge Dep."), 8:18-9:2, attached to EIS's Motion for Summary Judgment as Exhibit M. The plaintiff was not with his wife or daughter at any time at Southern Wholesale Furniture that day. Reeves Dep., 43:8-10; Lynn Reeves Dep., 42:3-18.

After selecting the furniture, Ms. Reeves completed an individual application for

credit in the plaintiff's name and signed the plaintiff's name on the application. Lynn Reeves Dep., 22:17-23; 24:9-25:3. Kelly Blackledge, the manager of Southern Wholesale Furniture, faxed the application to American General Finance. Blackledge Dep., 26:6-9. Ms. Blackledge testified that American General Finance denied the credit application, but, as standard procedure, did not provide a reason to Southern Wholesale Furniture. *Id.* at 27:15-24.

A representative from American General Finance testified, however, that the plaintiff's wife did not receive financing for the bedroom suite because, with a fraud alert on the plaintiff's credit file, American General Finance had to verify the customer's identity, but could not. Hirsch Dep., 47:7-17. This is contradicted by the testimony of Kelly Blackledge, the plaintiff and the plaintiff's wife. All three testified that the plaintiff was on the phone with his wife during the above transaction and gave her permission to apply for the credit in his name. Blackledge also disputes the American General's representative recitation of the incidents leading up to the credit denial.

EIS issued a credit report related to the plaintiff on the credit application that contained the fraud alert that his attorney requested be placed on the file in 2005. Fluellen Dec., ¶ 43. The credit report allegedly contained no derogatory accounts or inaccurate information. *Id.* at ¶ 44. EIS asserts that had American General been able to contact the plaintiff directly and verify his identity, the application for credit to purchase the plaintiff's daughter's bedroom suite would have been approved. Hirsch Dep., 47:20-21. As stated above, the plaintiff, his wife and Kelly Blackledge all dispute critical elements of Hirsch's testimony, especially concerning merely the need to verify the plaintiff's identity. In fact, Blackledge testified that American General merely denied the credit application with no explanation. There is no indication that American General

attempted to contact the plaintiff except the testimony of Hirsch, which upon close examination, appears to be questionable in its reliability.  Therefore, whether the plaintiff suffered damages from this transaction is fraught with factual disputes.

Other actual damages recoverable under the FCRA are for emotional distress. Courts adhere to a strict standard for emotional damages claims in FCRA cases "because they are so easy to manufacture."  *Sarver v. Experian Info. Solutions, Inc.*, 390 F.3d 969, 971 (7th Cir. 2004); *see also, Cousin*, 246 F.3d at 370.  EIS asserts that the plaintiff has failed to provide competent evidence to support a viable claim for emotional distress or non-economic damages and, therefore, any claims for such damages should fail as a matter of law.

The defendant asserts that the *Cousin* case, a case with allegedly worse facts than this one, is the seminal Fifth Circuit opinion addressing the strict standard for emotional distress damages under the FCRA.  In *Cousin*, the plaintiff's brother misappropriated the plaintiff's personal information to obtain auto loans and other services.  246 F.3d at 363.  When the fraud perpetrator failed to pay these debts, this delinquent information was reported on the plaintiff's credit file.  *Id.*  The plaintiff disputed the information reported on his credit file, but the defendant consumer reporting agency only partially corrected the plaintiff's credit report.  *Id.*  A potential credit grantor subsequently denied the plaintiff credit based upon the inaccurate reporting; the plaintiff alleged that he suffered emotional distress due to seeing his inaccurate credit report and the jury rendered a verdict in the plaintiff's favor.  *Id.* at 371.

Vacating a jury verdict for the plaintiff, the Fifth Circuit held that the award of emotional distress damages was not sufficiently supported by the evidence.  *Id.* Applying the Supreme Court's holding in *Carey v. Piphus*, 435 U.S. 247 (1978), the Fifth

Circuit held that proof of actual injury is required for compensatory damages to be awarded for mental or emotional distress. *Id.* To support an award for such damages, there must be evidence of genuine injury, such as the evidence of the injured party's conduct and the observations of others. *Id.* Further, to establish intangible loss, the Court requires "a degree of specificity which may include corroborating testimony or medical or psychological evidence in support of the damage award." *Id.* (citing *Patterson v. P.H.P. Healthcare Corp.*, 90 F.3d 927, 938 (5th Cir. 1996)).

EIS asserts that the plaintiff's description of his alleged emotional distress is insufficient, as it was in *Cousin*, to permit the issue to be submitted to a jury. The plaintiff's evidence of his alleged emotional distress are derived from his alleged inability to concentrate at work, lost sleep, and mental anguish due to collection calls, Reeves Dep., 48:14-24; 50:16-23. EIS asserts that this evidence is self-serving and conclusory, at best. The court would note, however, that if such evidence is not self-serving, it is likely not relevant. This argument is without much merit, at this stage of the proceedings.

EIS contends that the plaintiff has no corroboration for his alleged inability to concentrate at work. EIS states that he was unable, at his deposition, to provide any details to support his claim, such as medical records. Reeves Dep., 51:4-6. EIS supports this contention by asserting that even though the plaintiff testified that his co-workers knew of his inability to concentrate at work, he has not identified a single co-worker or supervisor that can testify at trial to corroborate his claim of "inability to concentrate." That is simply not consistent with the record. The plaintiff has specifically identified at least three co-workers with knowledge of his problems at work. There is, thus, a direct factual dispute as to this claim.

Next, EIS contends that the plaintiff has failed to present sufficient evidence to support his claim for punitive damages. The FCRA authorizes the imposition of punitive damages against a consumer reporting agency only in the limited circumstance where the agency "willfully fails to comply" with any provision of the FCRA. 15 U.S.C. § 1681n. To show willful noncompliance under § 1681n of the FCRA, the consumer must show that the defendant acted in reckless disregard of its FCRA obligations. *See Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 58 (2007). Recklessness, under *Safeco*, is "conduct violating an objective standard: action entailing an unjustifiably high risk of harm that is either known or so obvious that it should be known." 551 U.S. at 58. Thus, to establish a reckless violation, the plaintiff must prove that EIS acted in a manner that made it highly probable that harm would follow. *Id.* at 69.

The risk of harm must be substantially greater than the risk associated with actions that are merely careless. *Id.* Under *Safeco*, the question of whether EIS acted with reckless disregard for its obligations in the context of the FCRA is measured by an objective standard, so no examination of EIS's subjective intent is required. *See Safeco*, 551 U.S. at 69; *Levine v. World Financial Network Nat'l Bank*, 554 F.3d 1314, 1319 (11ᵗʰ Cir. 2009).

Here, EIS argues that the plaintiff has produced no evidence of willfulness or reckless disregard on the part of EIS. One of EIS's witnesses testified that an EIS operator made a mistake by not blocking Charles E. Reeves' social security number from the plaintiff's credit file to prevent Charles E. Reeves' accounts from reporting on the plaintiff's credit file. Fluellen Dep., 56:9-16. When the operator was attempting to separate the two credit files that were in the EIS database for the plaintiff (Charles A. Reeves) and Charles E. Reeves, the agent created a credit file for the plaintiff and

separated the two files, which is exactly what she was supposed to do.  Fluellen Dep., 164:11-18.  She failed, however, to properly block Charles E. Reeves' social security number from the plaintiff's file.  *Id.* at 56:9-16. As a second file was created in EIS's system for the plaintiff that populated with some inaccurate information.  *Id.* at 251:18-22.  EIS characterizes this as "single, inadvertent" mistake.  That will be for a jury to determine.  Viewing this in the light most favorable to the plaintiff, as the non-moving party, a reasonable fact-finder could well conclude that such a "mistake" and the continued mingling and reporting of incorrect information in the two credit files was reckless.

The plaintiff alleges that "Equifax failed to employ and/or implement proper procedures for the resolution of disputes relating to the improper reporting of credit information, and that Equifax has further failed to employ and/or implement proper procedures for the verification of accounts disputed by consumers."  Am. Compl. ¶ 41.  Though not stated specifically, the plaintiff appears to be asserting a claim for violation of § 1681i of the FCRA.

To establish a right of relief under 15 U.S.C. § 1681i, a consumer must demonstrate that a consumer reporting agency did not reinvestigate free of charge and either record the current status of the disputed information or delete the item from the file in the manner prescribed by § 1681i(a)(5) within the statutory period.  *See* 15 U.S.C. § 1681i(a)(1)(A).  To establish a claim for a violation of this section, the consumer must show that he or she notified the consumer reporting agency directly of a dispute within the relevant time for the case under the statute of limitations.  *See Bittick v. Experian Info. Solutions, Inc.*, 419 F. Supp. 2d 917, 918-19 (N.D. Tex. 2006).  Here, the relevant period of time for a claim for violation of §1681i is the two years preceding the filing of

the Complaint, March 16, 2007 through March 16, 2009.

EIS contends that it is undisputed that the plaintiff has not contacted EIS in more than five years and his attorney has not contacted EIS on his behalf since August 2005, and that the plaintiff's counsel has not contacted EIS at any time since August 2005. Each of these time-frames would be outside the FCRA's two-year statute of limitations.

Once again, the defendant cites to disputed information as undisputed. The plaintiff does indeed dispute the lack of contact within the statute of limitations period. There is direct testimony in the record to support a finding that contact was made and the defendant failed to act on it. Whether or not the allegations of contact are credible in not for the court to determine at this time. What is clear is that there is dispute incapable of resolution on summary judgment as to the required contact.

The plaintiff next claims that EIS violated § 1681e(a) by permitting Imagine/Fbofd, Verizon Wireless, Tower Loan, Sprint/Nextel, GEMB/Belk, GEMB/Wal-Mart to obtain his credit file between March 2007 and October 1, 2008. Am. Compl., ¶¶ 33-34, 36-39. To establish a cause of action for violation of 15 U.S.C. § 1681e(a), a plaintiff must show (1) that the consumer reporting agency made the disclosure to a person it did not have reason to believe had a statutorily authorized purpose for obtaining the report; and (2) that the consumer reporting agency failed to maintain reasonable procedures to prevent improper disclosures. *See Washington v. CSC Credit Services Inc.*, 199 F.3d 263, 266 (5th Cir. 2000). If the disclosure was made for a permissible purpose, then the inquiry ends and no investigation of the reasonableness of the procedures is necessary. *Id.*

Pursuant to 15 U.S.C. § 1681b(a)(3)(A), a consumer reporting agency may furnish a consumer report to a person whom it has reason to believe "intends to use the

information in connection with a credit transaction involving the consumer on whom the information is to be furnished and involving the extension of credit to, or review or collection of an account of the consumer." EIS contends that the plaintiff cannot show that EIS made the disclosure to a person it did not have reason to believe had a statutorily authorized purpose for obtaining the report and that EIS failed to maintain reasonable procedures to prevent improper disclosures. *See Washington*, 199 F.3d at 267 (plaintiff must first show a violation of § 1681b before bringing a claim that a consumer reporting agency violated the reasonable procedures requirement of § 1681e).

However, the plaintiff has produced evidence of numerous incidents of EIS providing credit information to companies with which he nor his wife had any business relations with and could not likely have had any interest in having access to the plaintiff's credit file. Indeed, the evidence before the court indicates that the wrong Mr. Reeves actually received at least one credit card based on the plaintiff's credit file and then defaulted on the account. There is, at a minimum, a factual dispute about this claim, making summary judgment inappropriate.

## STATE LAW CLAIMS - LIBEL

The plaintiff's libel claim is governed by Mississippi's one-year statute of limitations. *See* Miss. Code § 15-1-35. "Even though Mississippi law governs the applicable limitations period, federal [law] governs when a cause of action accrues." *Rivera v. Countrywide Financial Corp.*, 2006 WL 2431391, at *3 (S.D. Miss. Aug. 21, 2006); *see also Piotrowski v. City of Houston*, 237 F.3d 567, 576 (5th Cir. 2001). "Under federal law, the limitations period begins to run the moment the plaintiff becomes aware that he has suffered an injury or has sufficient information to know that he has been

injured." *Piotrowski*, 237 F.3d at 576.

Here, it is undisputed that the plaintiff became aware of the allegedly erroneous reporting when he applied for credit with The First on September 25, 2007. Reeves Dep., 157:21-158:18; Tidwell Dep., 57:5-58:10. The plaintiff did not file the instant lawsuit until March 16, 2009. Thus, the court agrees with the defendant that the plaintiff's libel claim is barred by the statute of limitations.

Additionally, the court finds that the plaintiff's libel claim is preempted by the FCRA and, accordingly fails as a matter of law on this independent ground. *See* 15 U.S.C. § 1681h(e) ("no consumer may bring any action or proceeding in the nature of defamation, invasion of privacy, or negligence with respect to the reporting of information against any consumer reporting agency . . . except as to false information furnished with malice or willful intent to injure such consumer."); *see also Cousin*, 246 F.3d at 375; Rivera, 2006 WL 2431391, at *3 ("Plaintiff's state law claims in the nature of defamation, invasion of privacy, or negligence with respect to the Defendants' reporting of information to a consumer reporting agency are preempted by § 1681h(e) unless Plaintiff proves 'malice or willful intent to injure' her.") (citing *Young v. Equifax Credit Info. Servs.*, 294 F.3d 631, 638 (5th Cir. 2002)).

"Although the FCRA does not define malice, [courts] have previously applied the common-law standard for malice when both parties agreed to such application." *Morris v. Equifax Info. Servs.*, 457 F.3d 460, 471 (5th Cir. 2006) (citing *Cousin,* 246 F.3d at 375) (requiring the plaintiff to show that the defendant, in publishing, either knew the words were false or published them with reckless disregard of whether or not they were true). Alternatively, the Fifth Circuit also has applied the *New York Times v. Sullivan* standard "as an example of a type of malice necessary to overcome a qualified privilege." *Morris*, 457 F.3d at 471 ("a statement is made with actual malice if it was made with knowledge

that it was false or with a reckless disregard of whether it was false or not").

Under either standard, the court finds that the plaintiff has not likely proffered evidence in this case that EIS acted willfully or maliciously to harm him. Indeed, when asked whether EIS was deliberately or intentionally trying to harm him, the plaintiff admitted that he has no evidence that EIS acted recklessly towards him or intentionally tried to harm him. Reeves Dep., 210:25-211:3; 211:7-9. Under these circumstances, there is no evidence whatsoever that EIS acted with a willful intent or malice to harm the plaintiff or his credit file. Accordingly, the plaintiff's state law claim for libel can not survive summary judgment.

For the reasons set forth in denying the defendant's motion for summary judgment, i.e., myriad factual disputes, the court concludes that neither is the plaintiff entitled to partial summary judgment against the defendant, EIS.

IT IS THEREFORE ORDERED AND ADJUDGED that the Motion for Partial Summary Judgment **[#135]** filed on behalf of the plaintiff is denied and the Motion for Summary Judgment **[#141]** filed on behalf of defendant, Equifax Information Services, LLC is denied except as to the plaintiff's state law claim of libel, which is granted with a separate judgment to be entered.

SO ORDERED AND ADJUDGED this the 20th day of May, 2010.

s/Keith Starrett
UNITED STATES DISTRICT JUDGE